May it please the Court, John Harbin for the Appellant, InVue Security Systems. With me is my partner, David Moreland. I plan to address three issues in regard to the 1236 appeal, all of which do overlap, so I'll only argue them one time. The first is the court limitation that applies to Claim 12, the 247 patent, as well as one claim of the 800 patent. The second is the single security code limitation that is a limitation in all the claims of the 800 patent. And the third is the limitation in Claim 20 of the 762 patent, as well as a claim in the 800 patent, that the key has a timer and is configured to inactivate if not reset. InVue brings up an analogous art distinction, and it argues that it wouldn't be obvious to combine Rothbaum and Denison, because Denison is directed to, quote, vending machines, not retail security devices, quoting from your BlueBrain. What's your response to the field of invention in each of the patents in suit, where it states that the invention, I'm quoting, relates to security systems and methods for protecting merchandise from theft? Doesn't it necessarily follow that Rothbaum and Denison are directed to the same field of protecting merchandise from theft? Yes, and to clarify one thing, Your Honor, in broad terms, that's true. We did not argue that they're not analogous, but they're about, I would, analogous is, in the case law, binary, yes or no issue. I would think there should be degrees, and I think this is about as far away as you can get from analogous. But more importantly to us is... But you can see that it's analogous, that's what you just said. Yes, but more importantly to us is the principle that even analogous art, you have to look at the full teachings, and it can discourage the combination, even when analogous, as in Polaris, and that is the situation we believe is the case here. And where we think a perfect example of this is in the court limitation. We think this is a limitation where the MTI proposed and the board adopted really hindsight of picking and choosing an element of the prior art to meet the limitations of the asserted claims with disregard of the teaching of the entire art. In that case, the claimant issue teaches comprising the security device comprises a port for receiving the key, and the 247 patent, it's a plurality of security devices. In the red brief at 1661, MTI asserts that, I'm quoting Inview, ignored its submission before the PTAB that use of a non-wireless key, which requires a port, would have been obvious, close quote. And MTI cites testimony from Inview's expert, agreeing that a person of skill in 2005 would know that two components, such as a key and a security device, could include a female electrical connection and the other a male electrical connection. Doesn't that admission cut against Inview's arguments on appeal regarding the obviousness of the claim clause? No, Your Honor, we do not think it does, given the teachings overall of Dennison, as well as the teaching of Rothman, but particularly Dennison, I mean, the board was persuaded by the teachings of Dennison that you would incorporate an electric key system from Dennison into Rothman based on the perceived advantages. Well, the key advantages cited in Dennison were wireless communication that is infrared and notes that it improves the security of the system because they're worried about exposure in the security device. So, they have the lock in Dennison hidden behind buttons and doors, and the infrared wireless communication is touted as enhancing that security. So, if one of the skill was going to look at that, you would not say, well, I'm going to disregard the teachings about security and incorporate a wired connection and a port because it's a system. Let me ask you about Claim 16 of the 247 patent and 35 to 38 of the 800 patent. Does Inview dispute that Dennison's key is programmed by a personal computer, Homebase? I'm sorry, Your Honor? Do you dispute that Dennison's key is programmed by a personal computer? That's Homebase 210. In some of the embodiments, the Dennison key is programmed by a computer. Okay. And you agree, then you'd agree that the external computer of Dennison is a programming station? Yes, Your Honor. I dispute that. Okay. Thank you. Counsel, a lot of the answers that you've provided so far to Judge Wallach's questions have really focused on the port, which I think is only in Claim 12 of the 247 patent. Are you dropping your analogous art arguments with respect to other claims? No, Your Honor. No, Your Honor. I get into that focused on the 846 patent, but no, we're just, we have limited time, so I was focused on particular issues, but no, we're not. We think, in general, the teachings of Dennison is aimed at a very different situation. Remote vending machines that are not alarmed with a lock, shielded lock, versus a security device in a retail store that is alarmed, that teaches, that focuses on a simple system, self-contained, avoiding extraneous components, and we think when you look at the two, you And the other problem we have with the combination is how conclusory a lot of the opinions were. And a lot, and some of the, for example, the argument that, you know, wired to wireless communication was well known and easy to do is simply saying it's the, well, one of the skill in the art could have done this, not would have done this given the teaching of the art, and as this Court has held many times. Isn't there an express reason, though, in Dennison? Dennison recognizes that mechanical keys have problems and that these electronic keys have certain advantages, including, you know, if you have employees that have the different keys, you can reprogram them. There's all these advantages listed, for example, on page A152 of the appendix. Why isn't that enough for providing motivation to combine or modify the primary reference in view of Dennison? Two reasons, Your Honor. One is the fact that the keys in, Dennison is dealing with a different situation of having multiple keys for multiple machines that are distributed around, and in fact, it's set up to handle, both the keys and the lock are set up to handle multiple codes at the same time. And on the other flip side of the situation, Rothbaum doesn't express a concern about the security of a mechanical lock. So your view is that because Rothbaum doesn't recognize a problem with the mechanical lock, that it's not, wouldn't it have been obvious to one in ordinary skill in the art to replace the mechanical lock with an electronic lock, given the statements in Dennison? Our concern is the Board didn't really address, seriously, any of the teachings of Rothbaum that are contrary to this combination. They only went, they only picked and chose among the ones they favored. What are the statements that are contrary to the combination? Excuse me? What are the statements that are contrary to the combination? In Rothbaum, it is, Your Honor, that it's a self-contained system, that it is a preference for a mechanical key, that they want to avoid complexity, which the Board did acknowledge that that is a factor expressed in Rothbaum, but they said it was overcome. But those are the primary three. Where does Rothbaum say there's a preference for a mechanical key, or does that just come from the fact that it's the only thing disclosed? I think that's correct, Your Honor. It doesn't even, it doesn't address mechanical versus electrical. That's correct. I want to ask you about Claim 20, where the Board said that Dennison doesn't disclose reprogramming or refreshing, but it nonetheless found that Claim 20 was obvious, because the claim doesn't require reprogramming or refreshing. Let's assume, hypothetically, for the moment, that the Board misconstrued the claim, and that the claim, as you argue, does in fact contemplate the capability of refreshing or reprogramming. Isn't reactivation and refreshing and reprogramming the same thing? Yes, Your Honor. Essentially, yes. So the Board has already found that Dennison discloses reactivation. Why isn't that sufficient to render Claim 20 obvious, even if their claim construction theory was incorrect? I do not remember the Board finding it teaches reactivation, Your Honor. With respect to Claim 35, for example. Of which, Pat, I'm sorry. Your Honor. It's Claim 35 of the 800, Pat. I think it's at Appendix Pages 115 to 17. My recollection is, and I want to address your question about Claim 35, my recollection is regarding Claim 20, the Board specifically found Dennison does not describe refreshing or reprogramming the code at all. Yes, but what I'm suggesting to you is that if Dennison discloses reactivation, that it necessarily discloses refreshing or reprogramming, because you've just admitted that they're the same thing. I apologize, Your Honor, I'm trying to address, but it may be a difference between the key and the code. I think what Dennison does not disclose is, clearly, is refreshing or reactivating the code, which is the refreshing and reactivation that's taught in Claim 20. And I don't think that's in dispute that Dennison does not teach that. Is that your argument for why Claim 20 isn't satisfied? Is it really because of the reprogramming and refreshing limitation? Or what is your argument with respect to Claim 20? Yes, well, to get there first, we have to, I think, reverse the Board's claim construction, because the Board found, essentially, that the capability of— Your argument is it has to have the capability to refresh or reprogram. But your problem, it seems to me, is if Dennison discloses reactivation, it automatically discloses refreshing or reprogramming, because you've admitted they're the same thing. I'm not sure if, Your Honor, if this answers your question, Your Honor, but Claim 20 of the 800 patent focuses on the programmable key being configured. No, it's Claim 20 of the 762 patent. Yeah, I think it's essentially— Anyway, I do not believe there's any evidence that the Board found that the Dennison key, the code in it can be refreshed or reprogrammed versus the key can be timed out of— No, but they did find that it discloses reactivation, which is the same thing. You can think about this. Do you want to save the rest of your time? Thank you, Your Honor. Okay, Mr. Norman. I will save the rest of my time for—I think we've addressed the issue. Mr. Norman. May it please the Court, I'm Alan Norman from Thompson-Coburn on behalf of Mobile Tech, Inc., and with me are my partners Anthony Blum, Matt Burnell, and David Jenkins. The only issue raised by Enview as to the vast majority of the claims on appeal is the obviousness of combining Rothbaum and Dennison. And the only issues raised by Enview with respect to the Rothbaum and Dennison combination are all issues of fact, motivation to combine, expectation of success, and what the references teach. And the substantial evidence supports the Board's factual findings. So Dennison and Rothbaum are both directed to security devices for protecting retail merchandise from theft. Dennison addresses— I think that was conceded already. Yes. Yes. Okay, so Dennison's primary point is addressing problems with mechanical keys. Counsel for Enview indicated that the primary limitation of Dennison is a wireless key. Its primary purpose is not a wireless key. It's an electronic key as opposed to a mechanical key. And it explains the advantages of keys that can be lost and stolen. I think we understand all of that. Okay, so—all right. Okay, then I'll move on. So the Board correctly found then that there was a motivation to combine. Also, the Board correctly found there was an expectation of success in the combination, and the Board correctly— Do you want to address—could you take a minute to address Claim 20 and specifically the question asked by Judge Dyke earlier to the appellant? I'm trying to remember which question in particular, but— The question was, do you concede as to Dennison that reprogramming is the same thing? Yeah, I would say reprogramming is the same as— So did your opposing counsel. Reprogramming and refreshing is the same thing as reactivation. I would say reprogramming, refreshing would— Reprogramming and refreshing would constitute— No, well, I don't know that reprogramming is necessarily reactivation because it could be— Well, the specification in a couple places says that in order to reactivate, you have to refresh or reprogram. Well, that doesn't make—that did not constitute, though, a definition. You're trying to support their argument? You're arguing away from their concession, in other words. Well, okay, I want to make sure that I'm understanding. With respect to Claim 35, I do agree that Dennison discloses reprogramming— In order to reactivate, you have to refresh or reprogram. They're the same thing, right? Correct. Okay. Yes. And then with respect to Claim 20, though, Claim 20 does not even require reactivation or refresh. Well, let's assume we don't agree with that. Okay. That Dennison still discloses refreshing or reprogramming because it discloses reactivation. Absolutely. It discloses reactivation in two ways. It can be either programmed before, and because you can change the different settings on the key to accommodate different work schedules and stuff like that, it can be taken back to the programming station and reprogrammed, refreshed, reactivated at that time. So Dennison, the combination of Rothbaum and Dennison, render obvious Claim 20 even— I mean, regardless how Claim 20 would be construed. What about the timing aspect where it's inactivated if that reprogramming or refreshing doesn't occur within a predetermined time? And that's precisely what happens because, as Dennison discloses, it can be programmed initially for different work schedules. So if the key—if nothing is done to the key, the key will time out and stop operating after a period of time. That is precisely what Dennison discloses. And if the key then—if the work schedule is changed, it could be refreshed, reprogrammed at that time. So, then, with respect to the single security code issue, the board correctly construed single security code as one security code. It rejected Inview's argument that the term imposes incapability on the programming station. Inview's definition is certainly not the ordinary meaning of the term single. There was no lexicography, no disavowal of the term single in the patent. In the context of the claims, Claim 35 of the 800 patent does not even require a code to be generated by the programming station at all. The code isn't even mentioned in the context of the programming station. So it would not make sense to construe Claim 35 as requiring a limitation or actually an incapability on the programming station. And, in fact, no claim of the 800 patent recites an incapability of the programming station. Moreover, for all the reasons set forth by the board, the single security code limitation is contrary to the specification. To address Inview's... To address the points raised by Inview with respect to Rothbaum and the self-contained... Can I back up for a second? You said none of the claims talk about the programming station generating the single security code. Did I misunderstand that? Yes. What I'm saying is Claim 35 does not require... But the claims that depend from Claim 35, for example, Claim 36, they talk about that generation. Yes. And some of the other independent claims do as well. But the point is since it's not a limitation that's in Claim 1, it would not make sense to be applying a restriction on the programming station concerning an inability of the programming station with respect to the security code. I understand what you're saying. I think what you're saying is that the board construed the term single security code to mean one security code, and there was no reason to read in anything about the programming station with respect to that. Correct. Okay. But then with respect to Rothbaum's... The notion that Rothbaum talks about the self-contained system, the modified Rothbaum system would still be self-contained because the self-contained system is the same components. It's going to be the alarm mechanism with all the different sensors. That hasn't been modified with respect to Rothbaum. What's been replaced is an electronic key as opposed to a mechanical key. And yes, an electronic key will not be integrated, but neither was a mechanical key. A mechanical key was never integrated. So when we look at the integration, the components that is being discussed in Rothbaum concerning integration, is this the same thing that would happen in a modified Rothbaum system? Also, Rothbaum never mentions any preference for a mechanical key, and certainly not a preference for a mechanical key over an electronic key, because it doesn't even mention electronic key. None of the issues with respect to Rothbaum concern really even the key system. That's not the focus of Rothbaum at all. Okay, anything more? Pardon? Anything more? I think I have no more, unless you have any more questions. No, thank you. Thank you. Mr. Harbin. Thank you, Your Honor. I think, Your Honor, I now understand your question. I think you were talking about the reactivation of operational limits in Denison, and does that require refreshing and reprogramming the key? We think no, it does not, and the Board was correct in that, and that's what I think Your Honor was getting at, that we do see a difference there. The specification in two places equates the two of them, but never mind. I'm sorry, what did you say? The specification equates the two of them. In two places it says that reactivation requires refreshing or reprogramming. Our specification. Yeah. But I don't think that equates to the Denison teaching of reactivating or the key operational limits means that is refreshing or reprogramming, as described in our patent. That's where I have the disconnect, if Your Honor understands what I'm saying. We agree reactivating the key does require, in our patent, refreshing or reprogramming the code. Correct. Okay. But it's not the same as the Denison reactivating the operational, which is our point. And briefly. Really? I thought I had five minutes, but I guess not. I thought I didn't use all my time. I thought I reserved five minutes. Yeah, but you used it up in the opening argument. I did. All right. All right. Thank you, Your Honor. It's all right. You have 18 seconds. That's enough time. All right. Out of order, we're going to take next number 18-1889, In-View Security Products, Inc. v. Mobile Tech, Inc. Mr. Harmon again.